**The STATE of Ohio, Appellee,**

v.

**GRUNDEN, Appellant.**

[Cite as *State v. Grunden* (1989), 65 Ohio App.3d 777.]

Court of Appeals of Ohio,
Paulding County.

No. 11–88–14.

Decided Dec. 29, 1989.

778

R. Kelly Ormsby III, Prosecuting Attorney, for appellee.
Eric Mertz, for appellant.

SHAW, Judge.

This is an appeal from a judgment of conviction and sentence rendered in the Common Pleas Court of Paulding County, following a jury trial in which the defendant-appellant DeWayne Grunden was found guilty of involuntary manslaughter and drug abuse. The charges arose from the death of the defendant's thirteen-month-old daughter, Jessica Grunden, who suffered a cardiac arrest following the ingestion of cocaine which the defendant had left on a coffee table in his home.

The defendant raises five assignments of error. In his first assignment, the defendant claims the trial court erred in overruling his motion to sever the charges in the indictment. The defendant was indicted on one count of involuntary manslaughter in violation of R.C. 2903.04(A), in which it was alleged that he caused the death of his daughter as the proximate result of his commission of a felony (possession of cocaine). He was also indicted separately on one count of drug abuse in violation of R.C. 2925.11 based upon the same possession of cocaine. Thus, the drug abuse charge in count one of the indictment also constituted the "underlying felony" upon which the involuntary manslaughter charge in count two of the indictment was based.

The factual foundation for the indicted charges, set forth at the suppression hearing and at trial, revealed that on the afternoon of June 11, 1987, the defendant's daughter was visiting with him in his home; that she had been put down for a nap in the bedroom and the defendant had also fallen asleep on the couch in the living room; that an undetermined amount of cocaine belonging to the defendant was lying on a coffee table beside the couch; that the child apparently awoke and came into the living room while the defendant was still asleep, ate some of the cocaine and expired from cardiac arrest. When the defendant awoke, she was discovered lying on the floor beside the coffee table. Subsequent rescue efforts by medical personnel were to no avail and she was pronounced dead on arrival at a local hospital.

The defendant does not contest the legal validity of the drug abuse charge as the underlying felony for the involuntary manslaughter. Rather, his complaint concerning the trial court's failure to sever is limited to an allegation of prejudice based upon a claimed desire to testify at trial on the involuntary manslaughter charge but not on the drug abuse charge. Thus, the defendant argues the prosecution should have been required to try these charges separately. We disagree.

At the outset we know of no authority, nor can we envision any rationale, under which the state could be required to sever a valid underlying offense from a charge of involuntary manslaughter pursuant to R.C. 2903.04. Nor

can we see any demonstration of prejudice to the defense in this case, given the fact that under this indictment, proof of the drug abuse charge was inevitable as an element of the overall offense of involuntary manslaughter. See Crim.R. 14. In any event, these charges were clearly " * * * based upon the same act * * * or * * * course of criminal conduct" and were properly joined under Crim.R. 8(A).

As for the defendant's stated desire to testify in the manslaughter case but not in the drug case, we are not convinced that traditional case authorities directed to joinder, setting forth the possibilities for prejudice (cumulation of evidence, unfair inferences of guilt, and prejudicial interference with defendant's right to testify or remain silent) have any application to a situation involving involuntary manslaughter under R.C. 2903.04, where the one charge in fact becomes an element of the second charge. See *State v. Williams* (1981), 1 Ohio App.3d 156, 158–159, 1 OBR 467, 470, 440 N.E.2d 65, 68. In any event, the defendant's mere allegation that he would have preferred to testify on one count, but not on the other, does not meet his burden of affirmatively showing that his rights were prejudiced by the joinder of multiple offenses for trial. See *State v. Long* (1984), 20 Ohio App.3d 377, 378, 20 OBR 483, 484, 486 N.E.2d 835, 836, citing *State v. Torres* (1981), 66 Ohio St.2d 340, 344, 20 O.O.3d 313, 315, 421 N.E.2d 1288, 1291, and *State v. Roberts* (1980), 62 Ohio St.2d 170, 16 O.O.3d 201, 405 N.E.2d 247. The defendant's first assignment of error is overruled.

In his second assignment of error, the defendant claims the trial court erred in failing to instruct the jury in accordance with his proposed jury instructions on the issue of proximate cause. However, our review of the trial record reveals that the instructions given by the trial court on proximate cause were not substantially different from those submitted by the defendant. More important, while not in the precise language of certain appellate decisions, the instructions given by the trial court accurately reflect the law of the state of Ohio regarding proximate cause, intervening cause and foreseeability as set forth in the leading Supreme Court and appellate court decisions of this state. See (specifically regarding the offense of involuntary manslaughter) *Black v. State* (1921), 103 Ohio St. 434, 133 N.E. 795; *State v. Nosis* (1969), 22 Ohio App.2d 16, 20, 51 O.O.2d 15, 18, 257 N.E.2d 414, 416; *State v. Chambers* (1977), 53 Ohio App.2d 266, 271–273, 7 O.O.3d 326, 329–330, 373 N.E.2d 393, 396–397; *State v. Losey* (1985), 23 Ohio App.3d 93, 95, 23 OBR 158, 159–160, 491 N.E.2d 379, 381–382. Accordingly, we find no prejudicial error in the trial court's refusal to instruct the jury in strict accordance with the language submitted by the defendant on the issue of proximate cause. The second assignment of error is overruled.

In his third assignment of error, the defendant claims the trial court erred in failing to suppress certain incriminating statements together with physical evidence which he claims was obtained only as the result of the illegally obtained admissions.

The record shows that upon the arrival of rescue personnel and a deputy sheriff to the defendant's residence, it was noticed that the defendant had not left the house with the ambulance transporting his daughter. A paramedic at the scene pointed this out to the deputy and together they approached the defendant's residence to investigate further. It is important to note that at this time neither the paramedic nor the deputy sheriff had any knowledge as to the circumstances of the child's injury or what they might find inside the house.

Upon knocking at the front door, a male voice beckoned them to enter and as they did, the defendant was observed kneeling on the dining room floor holding his other child, a three-year-old son, rocking back and forth, crying. Also present was a neighbor, presumed to be the one responding to their knock. The defendant was described as very distraught and emotionally upset and generally not responsive to any inquiry concerning taking him to the hospital except to say "she's dead, I killed her."

In addition, the neighbor handed the deputy two shotgun shells and another shell was observed by the deputy to fall from the defendant's hand. There were shotguns and other guns present in the bedroom. Accordingly, the deputy generally steered the defendant away from the bedroom and into the kitchen, still unaware as to the manner or circumstances of the infant's death.

During this time, the defendant's ex-wife arrived at the house and generally became hysterical at which point the deputy suggested that the defendant come outside with him which they did. Once outside the house, the defendant sat down under a tree in the yard and continued to blurt out at least three times, "I killed her." Finally, the deputy expressed the sentiment that there was no reason for the defendant to feel that way and asked him why he felt like that. For the first time, the defendant responded that, "she ate the coke I had on the table." There was no follow-up or further questioning by the deputy at that time.

Upon the arrival of additional law enforcement officers, they were briefed on the situation and, based upon the information they received, including the defendant's admissions, secured the residence pending a request for a search warrant. The warrant was subsequently obtained and resulted in the recovery of a small amount of cocaine from the floor beside the coffee table as well as a spoon from the coffee table which was found to contain traces of cocaine.

In the meantime, the defendant was transported to the hospital where he was approached by another police officer for the purpose of administering the *Miranda* warnings and taking a formal statement. However, prior to reading the warnings, the defendant asked the officer about his daughter's condition and the officer informed him that she was dead. Before the officer could proceed further, the defendant immediately responded that it was his fault; that he had left a gram of cocaine on the coffee table and fell asleep; that when he awoke, his daughter was lying dead on the floor beside the coffee table and that she must have eaten the cocaine. Upon being advised of his *Miranda* rights, the defendant indicated he had probably said too much already and requested his attorney. In response, the officer contacted the defendant's attorney who immediately came to the hospital and no further questioning took place.

In essence, the defendant claims the foregoing statements were made under extreme emotional stress brought about by the realization of his daughter's death; that law enforcement personnel improperly exploited this situation; and that these circumstances lead to a series of "involuntary" admissions as well as illegal "fruits" in the form of the cocaine and spoon recovered from his residence. We disagree.

■ The defendant makes much of references to his emotional condition at the scene, described by some on cross-examination as disoriented and even potentially suicidal. However, there was no medical or other expert testimony as to the extent of the defendant's state which was described by at least one of the paramedics at trial as normal under the circumstances. We also note that while still at the residence and prior to going outside with the deputy, the defendant apparently responded to a call from the hospital and indicated his consent for any necessary treatment. In addition, while at the hospital, again prior to his incriminating remarks to the officer, the defendant was observed to be drinking coffee and going outside the building to smoke cigarettes while waiting on word of his daughter's condition. Thus, we do not feel the record supports a conclusion that the defendant was in an emotional state to the degree that he lacked the capability to make voluntary or reliable statements about what had occurred.

■ In any event, the taking by the police of a confession from a suspect whose mental state at the time allegedly compelled him to confess has been held insufficient to establish the involuntariness of that confession, absent coercive police misconduct. See *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473. We find no coercive police misconduct here. On the contrary, none of the statements was obtained under anything approaching custodial interrogation. The statements volunteered by the defen-

dant at his residence were at best merely the product of permissible general on-the-scene questioning by law enforcement officers and others who were not yet aware of the circumstances of the incident. See *State v. Farndon* (1984), 22 Ohio App.3d 31, 37–38, 22 OBR 107, 113–115, 488 N.E.2d 894, 900–901, citing *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 481, 86 S.Ct. 1602, 1612, 1631, 16 L.Ed.2d 694, 706, 727, and *Rhode Island v. Innis* (1980), 446 U.S. 291, 298, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297, 306.

■ While the statements made at the hospital are probably distinguishable from those at the house by the fact that the defendant was by then a "focus of the investigation," the defendant was still not under arrest or even in a custodial setting. Certainly, the officer was obligated to truthfully inform the defendant as to his daughter's death in response to the defendant's direct question prior to commencing the formal interview. We are aware of no authority under which the defendant's remarks, volunteered prior to the officer's opportunity to continue with the *Miranda* rights, should be excluded or suppressed as violative of the *Miranda* decision.

Accordingly, under the foregoing authorities and the "totality-of-the-circumstances" test of *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, we find no merit to the defendant's allegations of constitutional violations in the obtaining of his statements. Having reached this conclusion with regard to the statements, we must reject his "fruits of the poisonous tree" rational pertaining to the physical evidence recovered from the residence as well. The third assignment of error is overruled.

■ In his fourth assignment of error, the defendant claims the evidence was insufficient to establish that his conduct proximately caused the death of his daughter and that the trial court therefore erred in failing to grant his motion for acquittal made at the close of the state's case and renewed at the close of the evidence.

Pursuant to Crim.R. 29(A), " * * * a court may not order an acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Brown* (1982), 7 Ohio App.3d 113, 117, 7 OBR 145, 150, 454 N.E.2d 596, 601, citing *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184. In other words, " * * * it is only where reasonable minds could not fail to find reasonable doubt that a motion for judgment of acquittal under Crim.R. 29(A) should be granted." *State v. Brown, supra,* 7 Ohio App.3d at 117, 7 OBR at 150, 454 N.E.2d at 601.

On the evidence of this case, together with the instructions of law discussed under the second assignment of error, reasonable minds could readily have

concluded at the close of the state's case that the infant's death was proximately caused by the defendant's conduct in leaving a gram of cocaine unattended on a coffee table, well within the reach and propensities of a thirteen-month-old child. Accordingly, we find no error in the failure of the trial court to grant the defendant's motion for acquittal. Additionally, we find on the trial record as a whole, that there is substantial evidence upon which the jury could reasonably conclude that all the elements of the offenses of drug abuse and involuntary manslaughter were proven beyond a reasonable doubt. See *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132. The fourth assignment of error is overruled.

In his fifth assignment of error, the defendant argues that the trial court committed prejudicial error in admitting over objection a single photograph of the deceased infant. Specifically, the defendant claims that any probative value of the photograph was outweighed by the danger of material prejudice to the defendant, particularly in view of the fact that the defendant stipulated to the cause of death from cocaine ingestion.

However, the Supreme Court of Ohio has held that the fact that a criminal defendant has stipulated the cause of death does not automatically render such a photograph inadmissible. See *State v. Maurer* (1984), 15 Ohio St.3d 239, 265, 15 OBR 379, 401, 473 N.E.2d 768, 791. Nor is the mere fact that a photograph is gruesome or horrendous sufficient to render it *per se* inadmissible. *Id.* Rather, "[p]roperly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *Id.* at syllabus.

It is also important to recognize that " * * * the trial court has broad discretion in the admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, * * * [a reviewing] court should be slow to interfere." *Id.* at 265, 15 OBR at 401, 473 N.E.2d at 791, quoting *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 302, 224 N.E.2d 126, 130, certiorari denied (1968), 390 U.S. 1024, 88 S.Ct. 1409, 20 L.Ed.2d 281. See, also, *State v. Hill* (1967), 12 Ohio St.2d 88, 41 O.O.2d 369, 232 N.E.2d 394 (murder scene photos admitted), and *State v. Williams* (1976), 47 Ohio App.2d 330, 1 O.O.3d 393, 354 N.E.2d 691 (autopsy photos admitted).

The photograph in this case is a single three-inch by five-inch color print depicting the deceased infant, clothed in a diaper lying on a table. The photograph was taken prior to any autopsy and although the evidence

established it was taken at the hospital morgue, that fact is not apparent from the close frontal vantage point of the picture. (A second photo submitted by the state in which it was apparent the child was in the morgue was excluded by the trial court.) There is nothing unduly gruesome about the photograph.

The photograph does depict however, the relative size and age of the child. Therefore, it is corroborative of the likely development of the child as it would pertain to the issue of foreseeability of the child's ability and propensity to eat something left unattended on a coffee table. In conjunction with a photograph of the coffee table also admitted at trial, the photograph of the infant thus had a direct bearing on the issue of proximate cause which was contested by the defendant.

We find no material prejudice to the defendant in this photograph. Its admission had probative value in the trial well within the standards of *State v. Maurer, supra,* and was not an abuse of the trial court's discretion. The fifth assignment of error is overruled and the judgment of the Common Pleas Court of Paulding County is affirmed.

*Judgment affirmed.*

EVANS, P.J., and MILLER, J., concur.